## LYONS *vs.* VAN RIPER and others.

1. If the complainant in an equity suit brought to set aside a conveyance of land, dies, leaving a will devising the land in controversy, and the devisee seeks to revive the original suit, he must afford the heirs-at-law of his testator an opportunity to dispute the validity of the will. For such purpose, an original bill, in the nature of a bill of revivor, is the appropriate process.

2. There is full testamentary capacity where testator's mind and memory are sufficiently sound to enable him to know and to understand the business in which he was engaged at the time he executed his will.

3. Where the testator is, for any cause, unable to read, before effect can be given to the will, it must satisfactorily appear to the court, either that it was read to him, or that in some other way he was made fully acquainted with its contents, and gave them his approval; but it is not necessary that the proof of the testator's knowledge of the contents of the will shall come from any particular source or witnesses; it may be established by ordinary means of proof, as any other fact.

4. Where the grantor is old, decrepit, and ignorant, it is the duty of the officer authenticating the execution of the deed, to make known to him its contents, by such means as will enable him to comprehend the nature and effect of his act. A simple, formal reading of the instrument is insufficient.

5. Conveyance set aside on the ground of fraud : the grantor, at the time of its execution, being old, infirm, and ignorant, and entirely under the influence of the grantee, in whom she had the most implicit confidence ; the conveyance stripping her of all her property, and the conduct of the grantee being deceitful, and grossly abusive of the confidence placed in him

Heard on pleadings and proofs.

*Mr. Kenny,* for complainant.

*Mr. Ryerson* and *Mr. A. B. Woodruff,* for defendants.

THE VICE-CHANCELLOR.

The first question to be decided in this case is, whether or not the present complainant, William Lyons, has a right to have the original suit stand revived. The suit was originally brought by Celia Van Winkle against Adrian Van Riper, to nullify the conveyance of a farm of about sixty-seven acres,

situate in Essex county, made by the former to the latter, on the ground that it was obtained by fraud. After it was at issue, and some testimony had been taken, Celia Van Winkle died, leaving a will devising the land in controversy to the present complainant. He thereupon filed an original bill, in the nature of a bill of revivor, setting up title to the land under the will, and making not only Adrian Van Riper, but the heirs-at-law of Celia Van Winkle, defendants. This course was unquestionably proper, for it is well settled that, if the complainant, in an equity suit brought to set aside a conveyance of land, dies, leaving a will devising the land in controversy, and the devisee seeks to revive the original suit, he can only do it in that mode which will give the heirs-at-law of his testator an opportunity to dispute the validity of the will. This cannot be effected by a simple bill of revivor, for the inquiry there is limited to the ascertainment of the person upon whom the law casts the inheritance on the death of the ancestor. In order, therefore, to bring those facts before the court which are necessary to afford an opportunity to dispute the title of the devisee, an original bill, in the nature of a bill of revivor, is held to be the appropriate process. *Story's Eq. Pl.*, §§ 377, 378 ; *Peer* v. *Cookerow*, 1 *McCarter* 365.

None of the defendants answered the bill of the present complainant, except Adrian Van Riper. He sets up incapacity and undue influence. No attempt was made, on the argument, to establish either of these objections. There is nothing in the evidence warranting the court in holding they are well taken. There is no doubt the mind of the testatrix was somewhat impaired by the decay of age and the mental strain and anxiety she suffered in consequence of what she esteemed the perfidious conduct of the defendant, but the proof of what occurred at the time the will was executed, especially the reasons she assigned for the disposition she made of her property, exhibit full testamentary capacity according to the measure required by the adjudications of this state. *Sloan* v. *Maxwell*, 2 *Green's Ch.* 570.

The objection most strenuously urged against the validity of the will on the argument was, that the proof did not show that it was read correctly to the testatrix, before execution, in the presence of both subscribing witness   The testatrix had been totally blind for two or three years before its execution.

Now, I think the rule is firmly established, that where the person executing a will is, for any cause, unable to read, whether from blindness, want of education, or weakness, before effect can be given to the will, it must be shown to the satisfaction of the court, either that it was read to him, or in some other way he was made fully acquainted with its contents, and gave them his approval, but the law does not prescribe that the proof of the testator's knowledge of the contents of the paper shall come from any particular source or witnesses. It may be established by the ordinary means of proof, as any other fact. Indeed, it has been held, if it is clearly proved the will in controversy was correctly copied from a previous will, the contents of which were fully made known to the testator, it is sufficient, and effect must be given to it, although it was not read to him, nor in his hearing. *Day* v. *Day*, 2 *Green's Ch.* 549 ; *Finchman* v. *Edwards*, 3 *Curteis* 63 ; *Redfield on Wills* 57, § 7.

In this case the proof is conclusive the testatrix fully understood the contents of the will when she executed it. It was drawn in her presence, in conformity to instructions given on the spot ; its disposition of her property was discussed by her and the scrivener, and one of the subscribing witnesses, and it was read twice to her by the scrivener—once on the day it was written, when he and she were alone ; and again on the next day, in the presence of one of the subscribing witnesses, when it was executed. On these occasions, as each paragraph was read, the scrivener swears he inquired whether it was right, and she replied it was.

The proof, in my judgment, fully establishes the validity of the will, and I therefore hold the present complainant, William Lyons, took, on the death of Celia Van Winkle, the estate which she had in the lands in controversy, and has a

right to have the suit stand revived against the original defendant.

As it is wholly immaterial, in this controversy, whether the codicil was properly executed, I have not examined the proofs on that question.

Since the filing of the second bill, the original defendant, Adrian Van Riper, has died intestate, and his heirs-at-law, pursuant to the statute, have been made defendants, and the suit, as against them, ordered to stand revived.

The evidence bearing on the main question, whether the deed made March 18th, 1868, by Celia Van Winkle to Adrian Van Riper, was obtained fraudulently or not, establishes, in my judgment, a case of rank, almost undisguised, fraud.

Adrian Van Riper admits, at the time the deed was executed, and for years before, he was the confidential adviser and friend of this old woman, perfectly familiar with her weaknesses and oddities, and possessing almost unbounded influence over her. According to his own story, at the time this deed was made she believed he was almost the only person in the world she could trust; that everybody else with whom she came in contact was seeking to rob and despoil her of her property, and that even the woman who lived with her, and took care of her, was plotting her murder, and intended to administer poison to her in her food. Miss Van Winkle was over seventy years of age, entirely blind, profoundly ignorant, unable to read or write, utterly unacquainted with business matters and the ways of the world. The property conveyed constituted nearly her entire means. Her defenceless and unfortunate condition, and the position of power and influence over her, occupied by Van Riper, renders it pre-eminently the duty of the court to examine, with the utmost care and scrutiny, the circumstances surrounding this most extraordinary transaction.

It must be assumed, the fair value of the farm, at the time of the conveyance, was at least $9500. Van Riper refused to give an opinion as to its value, but admitted he had

refused an offer of $7000. The proof shows, some two months after the conveyance Miss Van Winkle was offered $9600 in his presence, and he advised her to decline it, and not to sell for less than $12,000. The consideration expressed in the deed is $4000. Van Riper says Miss Van Winkle had desired him, or, to repeat him in his own words, she had been at him for years to take a deed for the farm, and give her a bond, binding himself to support her during life. This, he says, he persistently refused to do, because he thought he would be required to take her into his own family, and, also, because he thought it might be a hard bargain. He resisted her desire to convey him the farm, on these terms, for three years. She then proposed, if he would pay her $1000, to enable the person with whom she intended to live to build an addition to his house, and give a bond, binding himself to support her during life, she would convey him the farm. And, he says, then, for the first time, I consented. This, he claims, was the contract under which the deed was made.

It may be remarked, his choice of the bargains evinced a characteristic disregard of advantages. Most persons would more readily have accepted the first offer than the last, at least in dealing openly and for all fair advantages. By the first, he was only required to furnish support, but, under the second, he was required to pay $1000 in addition to support.

On the day the deed bears date, Van Riper executed a bond to Miss Van Winkle for $3000, conditioned to support her during life, to furnish her medical attendance during life, and to pay her funeral expenses on her death; but no money was paid or evidence of indebtedness given. Some days after, she sent William Lyons to Van Riper, to get $1000 he had promised to loan her until the farm was sold. When Lyons applied to him for the money, he declined to deliver it, stating, before he gave it to him he wanted a writing drawn between them. Two or three days after, they went to the scrivener who had drawn the deed and bond, and a paper was drawn by the scrivener, and signed by Lyons, and then Van Riper gave him $950. This paper has not been put in

evidence. Lyons does not know what it was. Van Riper and the scrivener have maintained absolute reticence respecting it. Van Riper says, Lyons was to have this $1000 to build an addition to his house, and he was to board Miss Van Winkle for the interest of it. This writing may have expressed such a contract. He never paid anything for her board, and never offered to do so until the existence of the deed was discovered, and he was charged with having procured it by fraud. Whatever the paper was, it is quite certain it utters nothing in explanation or defence of Van Riper's conduct. He has it, and was bound to produce it, if it would shed the slightest ray of light over this transaction.

The circumstances attending the execution of this deed, as given by the scrivener, do not show that any effort was made, at least such as the condition of affairs required, to place before the mind of this ignorant and sightless old woman, the nature and importance of the act she was about to perform. Van Riper and he met at her house by appointment. The papers had been prepared in advance, under Van Riper's instruction. They found Miss Van Winkle with the person who took care of her. Soon after they entered the house, they, with Miss Van Winkle, went into an adjoining room, leaving her attendant in the other, and there, while the three were alone, the papers were read, and the deed executed, without explanation or comment, except either before or after the execution of the deed, the scrivener *thinks* he said to Miss Van Winkle, he supposed she understood she was giving Van Riper a deed for her farm, and she replied she did, and then said *something* about Van Riper's attending to her business, and she was satisfied he would do what was right. She had no business to be attended to; if she meant what she was doing, she was stripping herself of all her possessions for a bare promise she should be sheltered, fed, clothed and buried. She was about to deprive herself of the power to make the most trifling gift, or of recognizing, at any time thereafter, the ties of blood or the claims of friendship; she was, indeed, reducing herself to a condition of respectable pauper-

ism. Such a complete surrender of personal independence and abandonment of property by a person under fear of being cheated, is highly improbable. The only evidence, outside of that given by the defendant himself, showing Miss Van Winkle understood, or had the slightest appreciation of what she was doing, is that of the scrivener already quoted. No person ever heard her say she contemplated such a disposition of her property, or that she had made it. Although her struggle to induce him to accept a deed, extended over a period of three years, no evidence whatever has been offered, showing she ever uttered a word on the subject to any other person, or to him in the presence of a third person; but the proof is clear, that at almost every interview occurring between them, after the date of the deed, she claimed to be the owner of the farm, and he fully recognized her claim. In dealing with persons in the helpless condition of this old woman, an officer, having power to authenticate the execution of deeds, is bound to go further than a simple, formal reading of the instrument. The contents are to be made known to the grantor by such means as will enable him to comprehend the nature and effect of his act. It is conspicuously manifest that that was not done in this case. I am satisfied the officer, by a grossly careless performance of his duty, unconsciously aided in the perpetration of a fraud, which he would have frustrated by the exercise of the care and vigilance the law requires him to employ in the discharge of his duties.

The proofs render it perfectly clear there never was any such contract or arrangement respecting the conveyance of the farm as that set up by the defendant. The infirmities of this old woman rendered it necessary she should sell it, and as early as the winter of 1867 she requested the defendant to sell it for her. From that time until the fall of 1868, whenever they met, which was quite frequently, he assured her he was making every possible effort to effect a sale, she generally expressing a desire to have a speedy sale made, and he advising her not to sell until a price could be obtained

equal to its value. In May, 1868, about two months after the date of the deed, Mr. Henry T. L. Hillman applied to the defendant to ascertain whether Miss Van Winkle would sell for $9000. He assured him she would not, and that it was useless for him to make her the offer, but Mr. Hillman insisted on making it, and the defendant and he went the same day to see her. Mr. Hillman made an offer of $9600. Miss Van Winkle replied she thought she ought to have $10,000, when the defendant interposed, and said she must not take less than $12,000. In the summer of 1868, Mr. George Allington applied to the defendant to learn where he could get a house. He instructed him to see Miss Van Winkle. He did so, and she gave him permission, in the defendant's presence, to take possession of the house on this farm, without the payment of rent, and he took possession. From the time he was authorized to sell, up to the discovery of the deed by Miss Van Winkle, everything the defendant did and said, his whole life, so far as it was connected with this farm, evinced a studied effort to conceal the existence of the deed, and to hold Miss Van Winkle out to herself and to the world as still the owner of it. When Miss Van Winkle discovered the paper she had executed was a deed for her farm, and not a simple authority to sell it, she sent for him. The moment she knew he was in her presence, she reproached him for his fraud, with great bitterness. He had no word of explanation or defence. He did not even pretend she had ever requested him to take a deed, much less that he had resisted her importunity to do so for three years.

On the argument, it was insisted the failure of Miss Van Winkle to support the charges of her bill by her own testimony, was proof there was no fraud in the procurement of the deed. I do not think so. Considering her age and ignorance, if she had attempted to give her recollection of her dealings with the defendant, it is not probable her evidence would have been entitled to much consideration or weight. I should be sorry to believe it was the duty of any

court to decide a case against a party, because he was unable or unwilling to swear it through by his own oath.

I will advise a decree nullifying the deed, and requiring the defendants to account for rents and profits of the land from the time possession was taken of it under the deed. The proof shows the $950 was advanced under an arrangement it should be repaid out of the proceeds of the sale of the farm. It should therefore be charged against the rents and profits.

The complainant is entitled to costs.